IN RE INTEREST OF WILLIAM H., A CHILD UNDER 18 YEARS OF AGE. STATE OF NEBRASKA, DEPARTMENT OF SOCIAL SERVICES, APPELLANT, V. WILLIAM H., APPELLEE.

533 N.W.2d 670

Filed June 20, 1995.   No. A-94-706.

Don Stenberg, Attorney General, Royce N. Harper, Lisa Swinton, and Beth Tallon for appellant.

No appearance for appellee.

SIEVERS, Chief Judge, and MILLER-LERMAN and INBODY, Judges.

MILLER-LERMAN, Judge.

The Nebraska Department of Social Services (DSS) appeals the June 16, 1994, decision of the juvenile review panel which denied DSS' request for review under Neb. Rev. Stat. § 43-287.01 et seq. (Reissue 1993). For the reasons recited below, we dismiss the appeal.

## FACTS

This case involves the disposition and placement of William "Andy" H., who was adjudicated to be under the jurisdiction of the juvenile court on September 28, 1992. The events leading up to Andy's 1992 adjudication are summarized as follows:

Andy was born on July 1, 1976. The record contains very little information about Andy's natural parents. However, it appears that due to severe neglect by Andy's natural mother, Andy and Andy's sister, Susie, began living in Kearney with Russell Peters when Andy was 4 years old. At that time, Russell was married to Andy's half-sister, Carol Peters. Russell and

Carol had two children of their own, Tanya and Kourtney Peters.

The record indicates that Andy's first contact with the juvenile court system occurred when he was adjudicated to be an abandoned child under Neb. Rev. Stat. § 43-247(3)(a) (Reissue 1993) on March 26, 1987. The details of the 1987 adjudication are unclear. It appears, however, that after the 1987 adjudication Andy continued to reside with Russell in Kearney.

In September 1987, Russell and Carol divorced, and Russell was granted legal guardianship of Andy and Susie. In 1988, Russell married Brenda Hunnell. Brenda had two children from a prior marriage, Crystal and Chad Hunnell. The record suggests that Andy did not get along with Brenda and that Russell and Brenda may have abused Andy during certain periods when he resided with them.

The record indicates that Andy had a history of minor contacts with the law and was adjudicated a second time on April 25, 1991, for an October 4, 1990, shoplifting incident and for furnishing false information to a police officer in regard to the shoplifting incident. In relation to the 1991 adjudication, Andy was sentenced to 6 months' probation, which he successfully completed on December 5, 1991. The record reflects that Andy began seeing a counselor in 1990, which date may be related to the 1990 shoplifting incident.

On July 22, 1992, Brenda reported to the Kearney Police Department that Andy had run away after an argument at the Peters residence. Andy advised that he ran away because he had been accused of sexually assaulting another child the previous night. Apparently, Andy had gone to see his counselor, who turned him over to the Kearney Police Department.

The record indicates that after the sexual assault, to which Andy later confessed, Russell would not allow Andy in his home and placed him at Richard Young Hospital in Kearney. DSS again instituted adjudication proceedings against Andy as a result of the sexual assault. On September 28, 1992, Andy was adjudicated to be a juvenile within the meaning of § 43-247(1) and (3)(b) because of the July 21, 1992, sexual assault and because he had threatened Crystal with a knife. After the

adjudication, Andy was placed at the Youth Development Center-Kearney and later transferred to the Youth Development Center-Geneva on October 2, 1992.

In November 1992, Andy entered West Pines Psychiatric Hospital in Wheat Ridge, Colorado. West Pines is a full-time psychiatric institution where Andy was enrolled in an all-male treatment program and was primarily under the care of a clinical social worker, Linda Plaut, and supervising psychiatrist Dr. Robert Kleinman.

Andy had been at West Pines for over a year when he became obsessed with finding his natural father, who he believed was living in the Colorado Springs area. Apparently, this obsession caused Andy to run away from West Pines on February 26, 1994. When Andy was found on March 1, he was returned to West Pines. However, at this time, the Nebraska medicaid peer review organization denied Andy funding for further treatment at West Pines. During March and April 1994, when Andy's placement was uncertain, Andy remained at West Pines, without being readmitted to a treatment program. The record suggests that when Andy learned of the pending discharge from West Pines, he felt angry and rejected, and he regressed considerably in his treatment.

After the denial of funding and the proposed discharge from West Pines, DSS reevaluated Andy's status. Darlene Meiners, the primary DSS caseworker on this case since May 13, 1993, prepared a new case plan and court report dated April 11, 1994. In the written recommendations to the court, Meiners suggested that "Andy be placed at a facility that can address his oppositional, sexual and passive/aggressive behaviors, as well as his conduct disorder, solitary, aggressive Paraphilia." We note that Meiners also stated in her summary that "[i]n this worker's professional opinion, it would not be in Andy's best interests to be placed in a foster home at the current time."

The county court for Buffalo County, sitting as a juvenile court, held a dispositional review hearing of this matter on April 15, 1994. There were two witnesses present at the hearing, Dr. John Riedler and Meiners. Plaut testified by telephone from Colorado. Dr. Riedler and Plaut testified on behalf of DSS, and Meiners testified for the State. The court received

into evidence as exhibit 4 the April 11 DSS written case plan and court report.

Plaut testified generally that she thought Andy had progressed at West Pines and that it would be in Andy's best interests to remain at West Pines and receive full-time institutional treatment. Plaut further opined that Andy was not ready to live in a foster home, where he would receive only outpatient psychiatric treatment. Dr. Riedler, a certified adolescent psychiatrist employed by DSS, testified that he believed Andy was becoming institutionally dependent and should be removed from the institutional setting to foster care. According to the record, Dr. Riedler's opinion was based exclusively on his review of Andy's written records, because he had never met or spoken with Andy. Dr. Riedler further stated that if the proposed foster care situation did not "work," Andy could be re-placed at West Pines or a similar facility for more intensive treatment. Meiners testified briefly regarding her understanding of why Andy ran away from West Pines and of why Andy was to be discharged from West Pines.

After hearing the witnesses' testimony, the court stated:

This is a difficult situation in the sense that this court is charged with looking after the best interest of Andy [H.] But in looking at that, I also cannot ignore society's interest. Unfortunately, I think that's been done too often in the past. I have no doubt if this were a case of dealing with an adult offender, given the conflicts in the testimony I heard today, I would err on keeping Andy in an institutional setting. Because I think everybody, even Doctor Riedler, acknowledges that there is a risk and problems existent and it probably comes down to one of philosophy. Doctor Riedler sounds like he's more willing to accept the consequences of that risk than, perhaps, I am. But this isn't an adult. This is a juvenile, who this court is going to lose jurisdiction over in approximately a year and three months. In July of 1995. And so, the question is, how best to try to make sure that that risk isn't going to exist after that time while acknowledging that it's always going to be there and we can't ever guarantee anything.

The court took the matter under advisement, and on April 20, 1994, issued an order rejecting the foster care proposal and directing DSS to maintain Andy at West Pines for a minimum of 6 months. In reaching this decision, the court stated:

> [T]his court can find little credence with [Dr. Riedler's] extreme and absolute rejection of the West Pines Treatment Plan both as recommended and as previously administered. While the DSS psychiatrist points to the lack of extreme abnormal behavior on the part of the juvenile as evidence that he has been misdiagnosed, this court feels, to the contrary, that it is evidence that he is improving during his treatment at the West Pines Facility. As stated, the DSS psychiatrist himself states that the juvenile would be replaced at West Pines in the event he reoffends or engages in some other extreme antisocial behavior. The court feels that it is not in either the juvenile's best interest or the community's to take that risk at this time.

DSS interpreted the court's order as adopting a plan different than it had recommended and filed a request for expedited review under § 43-287.01 et seq., which statutes provide for expedited review of a juvenile court decision if the court adopts a plan different than that proposed by DSS and if one of the parties believes the court-adopted plan is not in the best interests of the subject juvenile.

The review panel denied review of the case, finding that the court did not adopt a plan different than the one DSS proposed. The review panel determined that

> the Department of Social Services did file a prepared plan [exhibit 4] which is in the best interest of the minor; that the only evidence presented was by the two witnesses called by the Department; that the Department, in its plan, made specific recommendations as to the kind or type of treatment that was to be furnished to the minor, but that the two witnesses held differing opinions as to the preferred situs and as to the implementation of the treatment; that both opinions, although different, were consistent with the language of the submitted plan; that the trier of fact, by choosing one opinion rather than the

other, did make an order which directed the implementation of the plan prepared by the Department and that therefore a plan <u>different</u> from the plan prepared by the Department was <u>not</u> ordered to be implemented.

DSS appeals to this court the review panel's denial of review, generally assigning the following errors: (1) The review panel erred in ruling that the county court did not implement a plan different than the plan DSS had prepared, and (2) the review panel erred by failing to rule that the court-ordered plan was not in the best interests of Andy.

## SCOPE OF REVIEW

An expedited review of a juvenile disposition under §§ 43-287.01 to 43-287.06 to the juvenile review panel is permitted only when the juvenile court orders the implementation of a plan different than the plan proposed by the Department of Social Services for the care, placement, and services to be provided to the juvenile, and the department or any other party believes such court-ordered plan is not in the best interests of the juvenile. *In re Interest of A.K.*, 2 Neb. App. 662, 513 N.W.2d 42 (1994). An appeal from a final order or judgment entered by the juvenile review panel shall be reviewed by the Court of Appeals or the Supreme Court de novo on the record submitted to the panel. § 43-287.06.

Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the trial court's findings; however, where the evidence is in conflict, the appellate court will consider and may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over another. *In re Interest of J.T.B. and H.J.T.*, 245 Neb. 624, 514 N.W.2d 635 (1994); *In re Interest of J.A.*, 244 Neb. 919, 510 N.W.2d 68 (1994).

## ANALYSIS

The central issue in the instant case is whether the review panel properly denied review of DSS' appeal from the order of the county court. To qualify for expedited review by a juvenile review panel, the subject case must meet the requirements of § 43-287.01 et seq. The controlling language of § 43-287.01 provides:

The purpose of sections 43-287.01 to 43-287.06 is to provide for an expedited review of juvenile dispositions by the courts. It is the intent to allow such review only when a court orders the implementation of a plan different than the plan prepared by the Department of Social Services for the care, placement, and services to be provided to such juvenile and the department or any other party believes such court-ordered plan not to be in the best interests of the juvenile.

The Supreme Court recently interpreted the statutory requirements for expedited review in this manner:

We must next look to Neb. Rev. Stat. § 43-285(2) (Cum. Supp. 1992), which declares, in pertinent part: "The department or any other party may request a review of the court's order concerning the plan by a juvenile review panel as provided in section 43-287.04." Section 43-287.04 sets forth the procedure to seek such review. While standing alone the quoted language of § 43-285(2) would entitle the department to obtain an expedited review in any case, its reach is limited by the requirements set forth in §§ 43-287.01 and 43-287.03. The second sentence of § 43-287.01 and the provisions of § 43-287.03 require the application of a disjunctive test: First, the order must implement a different plan than that proposed by the department. Second, there must exist a belief in the department that the court-ordered plan is not in the best interests of the juvenile.

*In re Interest of M.J.B.*, 242 Neb. 671, 673-74, 496 N.W.2d 495, 498 (1993). Although the foregoing quotation uses the expression "disjunctive test," *In re Interest of M.J.B.* applied the test in a conjunctive manner, thereby requiring both adoption of a different plan and one said to be inconsistent with the best interests of the juvenile as precursors to expedited review panel consideration.

In the instant case, the predispositional case plan and court report contains DSS' only written "plan" for Andy's disposition. This plan generally states DSS' proposal that "Andy be placed at a facility that can address his oppositional, sexual and passive/aggressive behaviors, as well as his conduct

disorder, solitary, aggressive Paraphilia." The predispositional report further states the caseworker's opinion that "it would not be in Andy's best interests to be placed in a foster home at the current time."

To aid the court in making a determination regarding Andy's placement, DSS presented the testimony of Plaut and Dr. Riedler. The testimony of both Plaut and Dr. Riedler was consistent with the general nature of DSS' assessment of Andy's condition contained in DSS' written proposal, quoted above. However, the two witnesses had differing, conflicting opinions as to the best situs for Andy and the extent of treatment he required. Specifically, Plaut believed Andy should remain at West Pines, and Dr. Riedler believed Andy should be removed to a foster care arrangement in Nebraska subject to subsequent institutional placement if the need arose. Consequently, although DSS may have intended for the testimony of these two witnesses to clarify the specific parameters of its proposed plan, the witnesses' conflicting opinions as to the best placement for Andy served to confuse, rather than to clarify, the nature of the plan that DSS proposed. The trial court was, therefore, left to evaluate the opinions of the two witnesses and choose the one it believed to be in the best interests of the juvenile. Accordingly, the court ordered Andy to remain at West Pines pursuant to the testimony of Plaut and the written plan.

DSS sought expedited review by a review panel of the court's decision ordering Andy to remain at West Pines. The review panel denied review, finding that the case did not meet the statutory requirements for expedited review. Specifically, the review panel concluded that the court did not adopt a plan different from that proposed by DSS. Accordingly, the review panel did not address the "best interests" prong of the expedited review requirements set forth in *In re Interest of M.J.B.*, 242 Neb. 671, 496 N.W.2d 495 (1993). We note that as a practical matter, the juvenile court will lose jurisdiction over Andy as of July 1, 1995, and the review panel's denial of review effectively affirmed the dispositional decision of the county court.

On appeal to this court, DSS contends that the actual "plan" it proposed for approval by the county court was the foster care

arrangement espoused by Dr. Riedler and that because the county court adopted a disposition consistent with Plaut's testimony, rather than that of Dr. Riedler, the court-ordered plan was different from the one DSS proposed. DSS argues that for these reasons, the review panel improperly decided that the case was ineligible for expedited review. We disagree.

We have conducted a de novo review of the record and find that the court-ordered plan does not differ from the written one DSS submitted for court approval and the recommendations of DSS' witness Plaut. The court-ordered plan is consistent with the general directives of the only written plan in the record, which is contained in the predispositional case plan and court report. Further, the court-ordered plan follows the suggestions of one of DSS' conflicting witnesses, Plaut, who had been Andy's primary counselor for the last year and a half. Apparently, DSS asks us to interpret the contents of its plan, for purposes of determining its eligibility for expedited review, by ignoring the evidence it offered through Plaut's testimony and the written plan in favor of the opinion of Dr. Riedler, who has never met or spoken with Andy. We decline to do so. Based on our de novo review of the record, we conclude that this case did not meet the "different plan" prong of the two-pronged test for expedited review set forth in *In re Interest of M.J.B., supra.*

The county court's order did not implement a different plan than that proposed by DSS. Consequently, the review panel properly refused to consider the application for expedited review. Where the forum from which an appeal was taken lacks jurisdiction, an appellate court acquires no jurisdiction. *In re Interest of J.T.B. and H.J.T.*, 245 Neb. 624, 514 N.W.2d 635 (1994); *Garber v. State*, 241 Neb. 523, 489 N.W.2d 550 (1992).

APPEAL DISMISSED.