purpose. Additionally, and contrary to the Grimmingers' assertions, there is nothing in the covenants that affirmatively requires a lot owner to construct a residence on his or her lot before building any incidental structure in order to be in compliance with the residential designation. If the subdivision wished to preclude a lot owner from constructing this type of structure before constructing a residence, more specific covenants could have been drafted.

Accordingly, we find no violation of the restrictive covenants and determine this error to be without merit.

## CONCLUSION

Having determined that Mudloff's detached garage structure and current use of his lot do not violate the restrictive covenants, we affirm the district court's decision.

Affirmed.

———————

In re Interest of Montana S., a child
under 18 years of age.
State of Nebraska, appellee, v. Nicole S., appellee,
and Ann T., intervenor-appellant.
___ N.W.2d ___

Filed September 24, 2013.    No. A-12-1028.

1. **Juvenile Courts: Appeal and Error.** Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings.
2. **Jurisdiction: Appeal and Error.** A jurisdictional question which does not involve a factual dispute is determined by an appellate court as a matter of law, which requires the appellate court to reach a conclusion independent of the lower court's decision.
3. **Juvenile Courts: Jurisdiction: Appeal and Error.** In a juvenile case, as in any other appeal, before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it, irrespective of whether the issue is raised by the parties.
4. **Standing: Jurisdiction.** Standing relates to a court's power, that is, jurisdiction, to address issues presented and serves to identify those disputes which are appropriately resolved through the judicial process.
5. ____: ____. A party has standing to invoke a court's jurisdiction if it has a legal or equitable right, title, or interest in the subject matter of the controversy.

6. **Child Custody: Standing.** Foster parents of children who have been adjudicated as being without proper support have standing to object to a plan to change foster care placement of the children.

7. **Child Custody: Standing: Appeal and Error.** Because a foster parent has standing to object to a plan recommending a change in placement, a foster parent also has standing to appeal the juvenile court's decision to adopt such a plan and change the child's placement.

8. **Jurisdiction: Final Orders: Appeal and Error.** For an appellate court to acquire jurisdiction of an appeal, there must be a final order entered by the tribunal from which the appeal is taken.

9. **Final Orders: Appeal and Error.** The three types of final orders which may be reviewed on appeal are (1) an order which affects a substantial right and which determines the action and prevents a judgment, (2) an order affecting a substantial right made during a special proceeding, and (3) an order affecting a substantial right made on summary application in an action after judgment is rendered.

10. **Juvenile Courts: Appeal and Error.** A proceeding before a juvenile court is a "special proceeding" for appellate purposes.

11. **Final Orders: Appeal and Error.** A substantial right is affected if an order affects the subject matter of the litigation, such as diminishing a claim or defense that was available to the appellant prior to the order from which the appeal is taken.

12. **Juvenile Courts: Child Custody.** A juvenile court's order changing a child's placement to a different foster home affects a substantial right held by the child's current foster parent where that foster parent has been the child's primary caregiver during a vast majority of the juvenile court proceedings and for the majority of the child's life, and where all of the parties, including the Department of Health and Human Services and the State, agree that the foster parent should be considered as an adoptive placement for the child.

13. **Juvenile Courts: Minors.** The foremost purpose and objective of the Nebraska Juvenile Code is to promote and protect the juvenile's best interests, and the code must be construed to assure the rights of all juveniles to care and protection.

14. **Juvenile Courts: Child Custody.** Juvenile courts are accorded broad discretion in determining the placement of an adjudicated child and to serve that child's best interests.

15. **Evidence: Appeal and Error.** Where credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another.

Appeal from the Separate Juvenile Court of Douglas County: Vernon Daniels, Judge. Affirmed.

Regina T. Makaitis for intervenor-appellant.

Donald W. Kleine, Douglas County Attorney, Jennifer C. Clark, and Emily H. Anderson, Senior Certified Law Student, for appellee State of Nebraska.

Inbody, Chief Judge, and Irwin and Moore, Judges.

Irwin, Judge.

## I. INTRODUCTION

Ann T., the maternal grandmother of Montana S. and an intervenor in these juvenile court proceedings, appeals from an order of the juvenile court which granted a motion to change Montana's physical placement from Ann's home to a different foster home. For the reasons set forth herein, we affirm the decision of the juvenile court to grant the change in Montana's placement.

## II. BACKGROUND

These juvenile court proceedings involve Montana, who was born in September 2007. In January 2011, when Montana was approximately 3 years old, the State filed a petition in the juvenile court alleging that Montana was a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2008) due to the faults or habits of his biological mother, Nicole S.

The State filed its petition after it received information from Montana's maternal grandmother, Ann. Ann reported that Nicole had left Montana at Ann's home for approximately a week and had not yet returned. In addition, Ann reported that she believed that Nicole was using methamphetamines and was struggling with mental health issues. Ann indicated that she believed that Nicole was not currently capable of caring for Montana.

After the State filed its petition, the juvenile court entered an order granting the Department of Health and Human Services (the Department) immediate custody of Montana. The Department then formally placed Montana in Ann's home. Montana has continued to be placed with Ann throughout the majority of these juvenile court proceedings.

Ultimately, Nicole admitted that she had been using methamphetamines, that she had left Montana with Ann indefinitely, and that her actions placed Montana at risk for harm. In light of Nicole's admissions, the juvenile court adjudicated Montana to be a child within the meaning of § 43-247(3)(a).

After Montana was adjudicated to be a child within the meaning of § 43-247(3)(a), the juvenile court held disposition hearings in March, July, and September 2011, and in January and April 2012. At these disposition hearings, the juvenile court ordered Nicole to comply with a rehabilitation plan. The rehabilitation plan required Nicole to find stable housing and employment, to abstain from using alcohol and controlled substances, to complete a substance abuse treatment program, and to participate in supervised visitation with Montana. Such visitation was to be arranged through the Department. The juvenile court also ordered that Nicole's boyfriend, John B., was to have no contact whatsoever with Montana.

Ann attended the disposition hearing held in April 2012. At that hearing, the juvenile court advised Ann of her right to intervene in the juvenile court proceedings. On June 19, Ann filed a complaint for intervention. In her complaint, she indicated that she wished to intervene in the proceedings in order to receive notice of and participate in all hearings, to be granted custody of Montana during the pendency of the proceedings, and to be permitted to adopt Montana if Nicole's parental rights were terminated. After a hearing, the juvenile court entered an order, dated July 25, 2012, which granted Ann's request to intervene in the proceedings.

On July 24, 2012, the day before entry of the court's order granting Ann's request to intervene, all of the interested parties in the juvenile court proceedings, including Ann, Nicole, the State, Montana's guardian ad litem, and the family's foster care specialist, participated in a mediation "to discuss the case in regards to terminating parental rights and to provide the parties an opportunity to explore non-trial alternatives." During this mediation, it was agreed that Nicole would relinquish her parental rights to Montana and that Ann would be considered as an adoptive placement for Montana pending the completion of an adoption home study.

On July 26, 2012, the day after entry of the court's order granting Ann's request to intervene and 2 days after the mediation, the Department notified the juvenile court and all of the parties, including Ann, that it planned to change Montana's placement from Ann's home to a different foster home on August 3. The notice indicated that the Department had reason to believe that Ann was permitting Nicole to have unauthorized contact with Montana without proper supervision. Ann filed an objection to the proposed change in Montana's placement and asked the court to stay any change in placement until after an evidentiary hearing could be held. The court granted Ann's request for a stay and scheduled an evidentiary hearing.

Before an evidentiary hearing on the Department's request for a change in placement was held, Montana's guardian ad litem filed an ex parte motion for change of placement. In the motion, the guardian ad litem alleged that Montana would be at risk for harm if he were to remain in Ann's home. Specifically, the guardian ad litem alleged that Ann was permitting unsupervised contact between Montana and Nicole and that Ann had permitted John to have contact with Montana in contravention of explicit court orders. The guardian ad litem requested that Montana be immediately removed from Ann's home. In an order dated July 31, 2012, the juvenile court granted the motion of the guardian ad litem and ordered that Montana be removed from Ann's home.

In August 2012, a hearing was held concerning whether Montana's change of placement from Ann's home should be permanent or whether he should be returned to Ann's care.

At the hearing, the guardian ad litem presented evidence which established that during the pendency of the juvenile court proceedings, Nicole was permitted to have only supervised contact with Montana because there was some question about whether Nicole was still using controlled substances. The supervision was to be provided by a designated, third-party visitation worker to ensure that Nicole did not have contact with Montana when she was under the influence of any alcohol or drugs. Ann was aware of this court order. In fact, Ann had specifically requested a visitation worker to attend certain

family events so that Nicole could participate. Ann was permitted to supervise a visit between Nicole and Montana during the Christmas holiday in 2011, but this was a "one-time" occurrence, and Ann was made aware of that.

Despite the juvenile court order permitting only supervised contact between Nicole and Montana, the guardian ad litem presented evidence that Ann permitted Nicole to see Montana without a designated visitation worker in October 2011 and in April, May, and July 2012. Ann admitted to permitting unauthorized contact between Nicole and Montana.

The guardian ad litem also presented evidence that Nicole lived with Ann for a period of time after these juvenile court proceedings began and, thus, after Montana had been placed with Ann. There was also evidence that when Nicole lived with Ann, John was a frequent visitor at Ann's home, even though the juvenile court had specifically ordered that John was not to have any contact with Montana.

There was evidence that Ann has stated that she "breaks the rules all the time" so that Nicole can see Montana. In addition, there was evidence that on a separate occasion, Ann stated that "we don't always play by the rules."

Contrary to the evidence presented by the guardian ad litem, Ann testified that she did not intentionally disobey or disregard the juvenile court's orders concerning Nicole's visitation with Montana. Ann testified that she did not receive any of the juvenile court's orders. Ann admitted that she had permitted Nicole to see Montana on Mother's Day and Easter in 2012 without a visitation worker present. However, she testified that she believed these visits were authorized because she had previously been told she could provide supervision for Nicole's visits with Montana during family events. Ann also testified that she never left Nicole alone with Montana and that she made sure that Nicole was sober when she saw Montana. Ann testified that Nicole has not lived with her since November 2009, more than a year prior to the inception of these juvenile court proceedings. In addition, Ann testified that she has not permitted John to visit her home.

After the hearing, the juvenile court entered an order finding that it would be in Montana's best interests to grant the

motion for a change in placement. Specifically, the court found that the testimony and evidence presented by the guardian ad litem was credible and demonstrated that Ann permitted Nicole and John to have unauthorized contact with Montana and even permitted Nicole to reside in Ann's home during a time when Montana also resided there. The court stated, "Montana has been removed from the care of [Nicole] because she has placed the child at risk for harm. Allowing [Nicole] to reside in the home continues this child's exposure to risk of harm by [Nicole]. This particular risk was facilitated, aided, and abetted by [Ann]."

The court went on to find that Ann had knowingly and intentionally violated the court's orders in order to provide Nicole with time and access to Montana. The court stated:

> [Ann] has also placed this child at risk for harm by breaching the trust, promise and credibility required of foster parents. This process relies upon foster parents "playing by the rules". [Ann] has expressed to others that she does not play by the rules and that she was going to permit contact between [Nicole] and Montana. Such disregard of the court's orders cannot be sanctioned, tolerated and/or condoned as such violations are material.

The court ordered that placement of Montana "shall exclude the homes of [Nicole] and [Ann] until further order of this court."

Ann appeals from the juvenile court's order here.

### III. ASSIGNMENT OF ERROR

On appeal, Ann assigns three errors which we consolidate and restate into one error for our review. Ann asserts that the juvenile court erred in granting the motion to change Montana's placement from her home to a different foster home.

### IV. ANALYSIS

#### 1. Standard of Review

[1] Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings. *In re Interest of Meridian H.*, 281 Neb. 465, 798 N.W.2d 96 (2011).

[2] A jurisdictional question which does not involve a factual dispute is determined by an appellate court as a matter of law, which requires the appellate court to reach a conclusion independent of the lower court's decision. *Id*.

## 2. Jurisdiction

[3,4] In a juvenile case, as in any other appeal, before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it, irrespective of whether the issue is raised by the parties. See *In re Interest of Diana M. et al.*, 20 Neb. App. 472, 825 N.W.2d 811 (2013). Two jurisdictional issues are presented in this case. The first is whether Ann has standing to appeal from the juvenile court order changing Montana's placement. Standing relates to a court's power, that is, jurisdiction, to address issues presented and serves to identify those disputes which are appropriately resolved through the judicial process. *In re Interest of Meridian H., supra*.

[5] A party has standing to invoke a court's jurisdiction if it has a legal or equitable right, title, or interest in the subject matter of the controversy. See *In re Interest of Angelina G. et al.*, 20 Neb. App. 646, 830 N.W.2d 512 (2013). The purpose of an inquiry as to standing is to determine whether one has a legally protectable interest or right in the controversy that would benefit by the relief to be granted. *Id*. In order to have standing, a litigant must assert the litigant's own legal rights and interests and cannot rest his or her claim on the legal rights or interests of third parties. *Id*.

[6,7] The Nebraska Supreme Court has previously held that foster parents of children who have been adjudicated as being without proper support have standing to object to the Department's plan to change foster care placement of the children. See *In re Interest of Jorius G. & Cheralee G.*, 249 Neb. 892, 546 N.W.2d 796 (1996). It is clear, then, that Ann, as Montana's foster parent, had standing to object to the Department's decision to change the placement of Montana. Because Ann had standing to object to the Department's plan, we conclude that she must also have standing to appeal the juvenile court's decision to adopt the Department's plan and

change Montana's placement. To hold otherwise would seemingly diminish a foster parent's right to object to a change in placement at the trial court level.

Furthermore, Neb. Rev. Stat. § 43-2,106.01(2)(c) (Cum. Supp. 2012) states in relevant part that an appeal from an order of the juvenile court may be taken by certain persons, including "[t]he juvenile's parent, custodian, or guardian. For purposes of this subdivision, custodian or guardian shall include, but not be limited to, the Department . . . , an association, or an individual to whose care the juvenile has been awarded pursuant to the Nebraska Juvenile Code." Prior to the juvenile court's order changing Montana's placement, Ann was arguably an individual to whose care Montana had been awarded.

For these reasons, we conclude that Ann has standing to bring this appeal.

[8] The second jurisdictional issue presented by this appeal is whether the order granting the change in Montana's placement is a final, appealable order. For an appellate court to acquire jurisdiction of an appeal, there must be a final order entered by the tribunal from which the appeal is taken. *In re Interest of Jorius G. & Cheralee G., supra.*

[9,10] The three types of final orders which may be reviewed on appeal are (1) an order which affects a substantial right and which determines the action and prevents a judgment, (2) an order affecting a substantial right made during a special proceeding, and (3) an order affecting a substantial right made on summary application in an action after judgment is rendered. See *In re Interest of Karlie D.*, 283 Neb. 581, 811 N.W.2d 214 (2012). A proceeding before a juvenile court is a "special proceeding" for appellate purposes. See *id.* As such, we must determine whether the juvenile court's order changing Montana's placement affected a substantial right.

[11] The term "substantial right" has been defined as an essential legal right, not a mere technical right. See *In re Interest of Karlie D., supra*. A substantial right is affected if an order affects the subject matter of the litigation, such as diminishing a claim or defense that was available to the appellant prior to the order from which the appeal is taken. *Id.*

The Nebraska Supreme Court has previously held that an order changing a child's placement from a state-sponsored foster care home to the child's grandparents' home affected a substantial right of the State and was, as such, a final, appealable order. See *In re Interest of Karlie D., supra*. There, the Supreme Court held that once a juvenile has been adjudicated under § 43-247(3) and the court has granted the Department, and thus the State, custody of the child, the State has the right to recommend where the child should live. *In re Interest of Karlie D., supra*. See, also, *In re Interest of Tanisha P. et al.*, 9 Neb. App. 344, 611 N.W.2d 418 (2000) (holding that juvenile court order changing adjudicated child's placement from state-sponsored foster care home to child's grandmother's home affected substantial right of State and was final and appealable).

In addition, this court has previously regarded a change in placement pursuant to a juvenile court's approval of a Department plan to be a final, appealable order where the juvenile's guardian ad litem appealed from the decision transferring the juvenile from one foster home to another. See *In re Interest of John T.*, 4 Neb. App. 79, 538 N.W.2d 761 (1995).

[12] In this case, Ann, as Montana's grandmother, Montana's foster parent, and the intervenor in the juvenile court proceedings, appeals from the juvenile court's order which changed Montana's placement from Ann's home to a different foster home. Under the specific facts of this case, we conclude that the juvenile court's order affected a substantial right held by Ann. Ann has been Montana's primary caregiver during a vast majority of these juvenile court proceedings and, as certain evidence suggested, for the majority of Montana's life. And, just days prior to the Department's decision to change Montana's placement, all of the parties, including the Department and the State, agreed that Ann should be considered as an adoptive placement for Montana when Nicole relinquished her parental rights. The juvenile court's order changing Montana's placement not only removed Montana from Ann's immediate care, but also removed any chance that Ann had of being able to adopt Montana and care for him on a permanent basis.

Based on the specific facts of this case, we conclude that the juvenile court's order changing Montana's placement from Ann's home to a different foster home affected a substantial right and, thus, was a final, appealable order.

### 3. Change of Placement

Having concluded that Ann has standing to appeal from the juvenile court's order and that the order is final and appealable, we now address the juvenile court's decision to grant the motion to change Montana's placement. Ann argues that the juvenile court erred in granting the motion to change Montana's placement from her home to a different foster home. Specifically, she challenges the credibility of the witnesses who testified in support of the motion for a change in placement and asserts that the juvenile court failed to consider the evidence she presented in opposition to the motion. Upon our review, we cannot say that the juvenile court abused its discretion in granting the motion for a change in placement. Accordingly, we affirm.

[13,14] The foremost purpose and objective of the Nebraska Juvenile Code is to promote and protect the juvenile's best interests, and the code must be construed to assure the rights of all juveniles to care and protection. *In re Interest of Karlie D.*, 283 Neb. 581, 811 N.W.2d 214 (2012). Neb. Rev. Stat. § 43-285(2) (Cum. Supp. 2012) provides that once a child has been adjudicated under § 43-247(3), the juvenile court must ultimately decide where a child should be placed. See, also, *In re Interest of Karlie D., supra*; *In re Interest of Diana M. et al.*, 20 Neb. App. 472, 825 N.W.2d 811 (2013). Juvenile courts are accorded broad discretion in determining the placement of an adjudicated child and to serve that child's best interests. *In re Interest of Karlie D., supra*; *In re Interest of Diana M. et al., supra*.

In this case, the Department and Montana's guardian ad litem requested that the juvenile court order a change in Montana's placement. Pursuant to the language of § 43-285(2), the Department and the guardian ad litem had the burden of proving that the change in placement was in Montana's best interests. See *In re Interest of Ethan M.*, 19 Neb. App. 259, 809

N.W.2d 804 (2011). As such, the question presented by this case is whether there was sufficient evidence presented at the hearing to prove that a change in placement was in Montana's best interests.

At the hearing, the guardian ad litem presented evidence that Montana was at risk for harm in Ann's home because Ann repeatedly permitted Montana's mother, Nicole, to see him without a designated third-party visitation worker present. In addition, there was evidence that Ann had even permitted Nicole to live in her home with Montana for a period of time during the juvenile court proceedings and that during that same period of time, Ann had allowed Nicole's boyfriend, John, to have contact with Montana. These actions were contrary to explicit court orders which provided that Nicole was to have only supervised visitation with Montana and that John was to have absolutely no contact with Montana. Furthermore, these actions were contrary to Montana's best interests, because Nicole was struggling with an addiction to controlled substances and was not complying with court orders meant to help her rehabilitate herself.

Additionally, there was evidence that Ann had knowingly and intentionally disobeyed the court's orders by her actions. She repeatedly stated that she did not follow "the rules" and that she would permit Nicole to see Montana without proper supervision.

Taken together, the evidence presented by the guardian ad litem indicates that Montana would be at risk for harm if left in Ann's home. The evidence demonstrates that Ann has put Nicole's interests ahead of Montana's interests and that Ann is not willing to abide by the court's orders. As such, we find that there was sufficient evidence presented to demonstrate that a change in Montana's placement was in his best interests.

We recognize that Ann presented evidence to contradict the guardian ad litem's evidence. Specifically, she testified that she did not allow Nicole to live with her during the juvenile court proceedings, that she was allowed to supervise visits between Nicole and Montana during family events, and that she did not ever permit John to visit her home and have contact with

Montana. In addition, Ann testified that she did not intentionally disobey the court's orders.

On appeal, Ann asserts that the evidence presented by the guardian ad litem was not credible and did not definitively establish that she intentionally disregarded the court's orders or that she permitted Nicole to live with her during the pendency of the juvenile court proceedings. In her brief, Ann points to portions of her testimony where she specifically refuted such evidence. Ultimately, however, Ann's assertions relate to the juvenile court's decisions about credibility and about the weight to be given certain evidence.

[15] In its order, the juvenile court explicitly stated that it had considered Ann's testimony, but gave such testimony "no weight . . . as it is inconsistent with the greater weight of the evidence." In addition, the court stated that it found the evidence presented by the guardian ad litem "to be credible, probative and entitled to weight." The juvenile court's statements clearly indicate its finding that the guardian ad litem's evidence was more credible than Ann's testimony. And, as we have often stated, where credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *In re Guardianship of Jordan M.*, 20 Neb. App. 172, 820 N.W.2d 654 (2012).

Given the broad discretion that a juvenile court possesses in determining the placement of an adjudicated child, and given the juvenile court's explicit findings regarding the credibility of the evidence presented at the hearing, we cannot say that the juvenile court abused its discretion in granting the motion to change Montana's placement from Ann's home to a different foster home. We affirm the decision of the juvenile court.

## V. CONCLUSION

We find that Ann has standing to appeal the juvenile court's order changing Montana's placement and that the order is final and appealable. However, upon our de novo review of the record, we find that the record supports the juvenile court's

order changing Montana's placement from Ann's home to a different foster home and that such order is in Montana's best interests. Accordingly, we affirm.

Affirmed.